*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DANIEL WEHNER, Personal Representative of the
ESTATE OF DALE WEHNER,

        Plaintiff-Appellant,

v

TRI-HOSPITAL EMERGENCY MEDICAL
SERVICES CORPORATION, WYATT RIEHL,
SCOTT ROBINETTE, JASON BURDEAUX, and
ELAINA KOCIS,

        Defendants-Appellees.

FOR PUBLICATION
October 23, 2025
12:09 PM

No. 370562
St. Clair Circuit Court
LC No. 23-000427-NI

Before: SWARTZLE, P.J., and ACKERMAN and TREBILCOCK, JJ.

SWARTZLE, P.J.

Plaintiff sued defendants, alleging that they failed to provide appropriate emergency medical services to plaintiff's decedent, Dale Wehner. The trial court granted summary disposition to defendants after concluding that the immunity provisions of the emergency medical services act (EMSA), MCL 333.20901 *et seq*., applied and that plaintiff failed to establish that a question of fact existed with respect to whether defendants' actions constituted gross negligence. Although the trial court correctly concluded that the EMSA applied to this case, it erred when it found that there existed no question of fact with respect to whether defendants were grossly negligent. Accordingly, we reverse in part the trial court's grant of summary disposition to defendants.

## I. BACKGROUND

In late September and early October 2021, Dale and his wife, Carol Wehner,[1] were not feeling well. The record is unclear as to the nature of Carol's illness, however, it appears that on September 29th, Dale tested positive for COVID-19. In the days that followed, Dale's condition

---

[1] Because several witnesses share the same last name, we will refer to them by their first names in an effort to avoid any confusion.

deteriorated and family members, on three separate days, sought urgent medical services from defendant Tri-Hospital Emergency Medical Services (THEMS). On October 3rd, 5th, and 7th, THEMS dispatched an ambulance to Dale's home. This action arises out of the first two contacts.

Because Dale, then 57 years old, died at his home on October 7th, and Carol died before she could be deposed in this matter, the only eyewitness accounts to the events inside the Wehners' home came from the individual defendants: Wyatt Riehl, Scott Robinette, Jason Burdeaux, and Elaina Kocis. Daniel Wehner, Dale's son and plaintiff in this action, and Rachell Wehner, Daniel's wife, witnessed some of the events occurring in the days preceding Dale's death.

Plaintiff filed a medical malpractice wrongful-death action, naming as defendants THEMS and Riehl, Robinette, Burdeaux, and Kocis, the four individual emergency medical responders. In Count I, plaintiff alleged that the individual defendants were guilty of gross negligence, malpractice, or both, when they failed to "properly, fully, and completely" evaluate, monitor, assist, treat, and care for Dale in October 2021. Specifically, plaintiff alleged, among other things, that the individual defendants were grossly negligent when they failed to provide Dale with supplemental oxygen and transport him to the hospital for further assessment and care. Plaintiff further alleged in Count I that THEMS was vicariously liable for the acts of its employees, and that it was directly liable based on its gross negligence in the hiring, employing, training, and supervising of its paramedics and EMTs; and in the promulgating of rules, regulations, policies, protocols, and procedures relative to the providing of emergency medical services.

In Count II, plaintiff reiterated that defendants' acts or omissions, or both, constituted gross negligence because they were so reckless as to demonstrate a substantial lack of concern for whether an injury resulted to plaintiff's decedent. Further, plaintiff alleged that at no time did Dale refuse treatment or transport to the hospital and that defendants fraudulently entered Dale's name and initials into the signature box of electronic forms concerning refusal of treatment. Lastly, plaintiff alleged that Dale died as a consequence of defendants' gross negligence and malpractice.

Defendants moved for summary disposition under MCR 2.116(C)(7) and (10), arguing, among other things, that plaintiff's claims were barred by the statutory immunity provided under the EMSA. Specifically, defendants argued that under the EMSA, defendants were immune from liability unless their actions amounted to gross negligence or willful misconduct. In this regard, defendants argued that, as a matter of law, their actions did not rise to the level of gross negligence or willful misconduct. Moreover, defendants argued that they could not be held liable under a theory of medical malpractice because there was no question of fact that Dale refused all medical treatment and transport to the hospital.

In response, plaintiff argued that the liability limitation included in the EMSA applied only when emergency medical personnel are engaged "in the treatment of a patient." Plaintiff then reasoned that because the evidence showed that defendants never provided any treatment to Dale, the EMSA did not apply. Alternatively, plaintiff argued that if the EMSA applied, a question of fact existed regarding whether defendants' actions amounted to gross negligence. Plaintiff argued that the conduct of all four individual defendants during both the October 3rd and 5th calls were a proximate case of Dale's injuries and death.

At the hearing on defendants' motion, the trial court found that the EMSA applied to this case and that there existed no genuine issue of material fact regarding whether defendants' conduct constituted gross negligence. The trial court granted defendants' motion for summary disposition, and plaintiff appealed.

## II. ANALYSIS

### A. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Sherman v St Joseph*, 332 Mich App 626, 632; 957 NW2d 838 (2020). Summary disposition under MCR 2.116(C)(7) is appropriate when a claim is barred because of immunity granted by law. *Mays v Governor*, 506 Mich 157, 181; 954 NW2d 139 (2020). With respect to MCR 2.116(C)(10), summary disposition is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). Under both motions, this Court considers the pleadings as well as any evidence submitted by the parties. *Bauserman v Unemployment Ins Agency*, 503 Mich 169, 179; 931 NW2d 539 (2019); *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018).

### B. EMSA

Plaintiff asserts that the trial court erred when it found that the EMSA and its grant of limited immunity applied to this case. He argues that the EMSA only provides immunity when emergency medical personnel are providing treatment. Because defendants did not treat Dale, a necessary predicate to immunity is absent, according to plaintiff.

The EMSA provides, in pertinent part, the following:

> Unless an *act or omission* is the result of gross negligence or willful misconduct, *the acts or omissions* of a medical first responder, emergency medical technician, emergency medical technician specialist, paramedic, medical director of a medical control authority or his or her designee, or, subject to subsection (5), an individual acting as a clinical preceptor of a department-approved education program sponsor while providing services to a patient outside a hospital, in a hospital before transferring patient care to hospital personnel, or in a clinical setting that are consistent with the individual's licensure or additional training required by the medical control authority including, but not limited to, services described in subsection (2), or consistent with an approved procedure for that particular education program *do not impose liability in the treatment of a patient on those individuals* or any of the following persons:
>
> * * *
>
> (d) The life support agency or an officer, member of the staff, or other employee of the life support agency. [MCL 333.20965(1) (emphasis added.)]

The EMSA creates several conditions that must be met before a defendant can enjoy immunity under the act. First, a defendant must hold one of the listed occupations: "a medical first

responder, emergency medical technician, emergency medical technician specialist, paramedic, medical director of a medical control authority or his or her designee, or . . . an individual acting as a clinical preceptor of a department-approved education program sponsor." MCL 333.20965(1). See also *Bartalsky v Osborn*, 337 Mich App 378, 385; 977 NW2d 574 (2021). Next, the alleged wrongful act must have occurred in a particular location, specifically, " 'outside a hospital, in a hospital before transferring patient care to hospital personnel, or in a clinical setting.' " *Bartalsky*, 337 Mich App at 385, quoting MCL 333.20965(1). And then, of particular relevance to this case, the act or omission must occur " 'while providing services to a patient' " and " 'in the treatment of a patient.' " *Id.* at 387, quoting MCL 333.20965(1).

The only inquiry at issue in this claim of error is whether defendants' interactions with plaintiff's decedent qualified as "treatment" under MCL 333.20965. Plaintiff posits that because his theory of liability is premised on the *lack* of any treatment or transportation provided to Dale, it is axiomatic that defendants were not engaged "in the treatment of a patient" and therefore, defendants cannot avail themselves of the immunity afforded by the EMSA. This is a blinkered view of the act.

Reading the statutory immunity provision in its entirety, and considering the plain meaning of the word "treatment," it is clear that a person who allegedly failed to perform a particular act can still have done so while providing treatment to a patient. To interpret the statute otherwise would render other phrases in the statute nugatory. The EMSA specifically states that "[u]nless an act *or omission* is the result of gross negligence or willful misconduct, the acts *or omissions* of a medical first responder . . . do not impose liability in the treatment of a patient on those individuals." MCL 333.20965(1) (emphasis added). The plain language of the statute specifically contemplates immunity for ordinary negligent actions and omissions and permits liability for grossly negligent actions and omissions. Concluding that the EMSA does not apply to circumstances where a plaintiff's theory of liability is based on the failure to act would render half of the phrase "act or omission" nugatory. Such a result would violate an oft-quoted tenet of statutory interpretation that "we must give effect to every word, phrase, and clause and avoid an interpretation that would render any part of the statute surplusage or nugatory." *South Dearborn Environmental Improvement Ass'n, Inc v Dep't of Environmental Quality*, 502 Mich 349, 361; 917 NW2d 603 (2018) (quotation marks and citation omitted).

Ultimately, the inquiry is quite simple: "to qualify for immunity, a defendant must show, among other things, that the act or omission occurred 'in the treatment of a patient.' " *Bartalsky*, 337 Mich App at 392. On this record, it is clear that defendants' interactions with Dale constituted treatment, though admittedly not in the manner plaintiff alleges was necessary. On both the October 3rd and 5th runs, the individual defendants assessed Dale's medical situation, took certain vital signs (e.g., blood pressure), and advised him on what to do to improve his medical situation (e.g., pain medication and hydration). Plaintiff maintains that more should have been done, and plaintiff might well be correct. But, even considering the evidence in the light most favorable to plaintiff as the non-movant, the record shows that defendants provided Dale with some medical services and offered some medical advice, i.e., they provided treatment to him. Thus, defendants' alleged material omissions—failing to administer oxygen and transport to a hospital—occurred in the course of treatment.

Accordingly, the trial court did not err when it concluded that the EMSA provided immunity to defendants for ordinary negligence. Plaintiff, therefore, had to demonstrate the existence of a material fact related to gross negligence to prevail. We turn to that question next.

## C. GROSS NEGLIGENCE

On gross negligence, plaintiff argues that even if the trial court correctly determined that the EMSA applied to the circumstances in this case, summary disposition was still inappropriate because a question of fact existed with respect to whether defendants' actions amounted to gross negligence.

In *Jennings v Southwood*, 446 Mich 125, 136; 521 NW2d 230 (1994), our Supreme Court noted that the provisions of EMSA had a common purpose with the governmental tort liability act (GTLA), MCL 691.1401 *et seq.* Both shared the common purpose of immunizing certain agents from ordinary negligence and permitting liability for gross negligence. *Jennings*, 446 Mich at 136. Accordingly, the Court found that the terms of the GTLA and EMSA should be read *in pari materia*. *Id.* Specifically, the Court "deem[ed] it appropriate to use the definition of gross negligence found in § 7 of the GTLA, as the standard for gross negligence under the EMSA." *Id.* at 137. The GTLA defines gross negligence as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(2)(c). Evidence of ordinary negligence does not create a material question of fact concerning gross negligence. *Maiden v Rozwood*, 461 Mich 109, 122-123; 597 NW2d 817 (1999). Rather, a plaintiff must produce proof of conduct "so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.* at 123.

This is not a situation where a plaintiff points solely to a failure to transport to a hospital as the basis for liability. Here, plaintiff alleges that defendants told Dale that he would be fine and that he should not go to the hospital because it was full. In contrast, each defendant testified that Dale's condition was so dire that it was imperative that he go to the hospital. In fact, they have consistently argued that Dale was advised of the risks of declining treatment, yet he voluntarily chose not to be transported to the hospital for further evaluation or treatment. In support, defendants rely on their own testimony and the assertion that Dale, on October 3rd, purportedly signed his name in the signature box acknowledging that he was declining treatment and transport, and on October 5th, he purportedly placed his initials in the relevant signature box. Whether Dale actually signed or initialed the documents is in dispute.

It is notable that Dale's name is badly misspelled in the signature box of the Patient Care Report (PCR) generated for the October 3rd ambulance run ("Sehren" rather than "Wehner"), and only the initials "DW" were placed in the signature box relative to the October 5th run. Further, the signatures purporting to be Dale's were time-stamped well after defendants left the home and match the time-stamp relative to Robinette's signature for the October 3rd run and Kocis's signature on the PCR for the October 5th run. Robinette testified during his deposition that he did not know how the time-stamping worked, but he surmised that when he completed and signed the forms "post-call," the electronic system simply dated and time-stamped all of the signatures, including his and Dale's, with the same time-stamp, i.e., "10/03/2021 17:30." If this were true, then it begs the question, why do the other signature boxes on the same document have different time-stamps?

-5-

In addition to the signature box for the refusal of treatment, there was also a signature box for the patient to sign and acknowledge that he was financially responsible for the ambulance services and that he received the THEMS privacy notice. Relative to the financial responsibility signature box, the signature purporting to be Dale's is, again, misspelled, and it is time-stamped "17:04." Regarding the privacy notice, the signature box is empty, but it is date and time-stamped "Dale Sehren-10/03/2021 18:16." If a benign explanation existed to explain why Dale's purported signature and the paramedic's signatures had the same time-stamp, then it would be expected that all of the signatures on the PCRs would bear the same time-stamp. The fact that they do not gives rise to a question of fact regarding whether Dale actually refused treatment and transport and acknowledged his decision by affixing his signature in the appropriate signature box.

Added to these discrepancies, Grace Warmbier, a trained document examiner, examined the signature and initials in the signature boxes acknowledging the refusal of treatment or transport. She compared those signatures to known handwriting samples and concluded that Dale did not sign the refusal of services.

The foregoing evidence casts sufficient doubt on the assertion that Dale placed his signature and initials in the signature boxes acknowledging that the risks had been explained and he was nonetheless refusing services and transportation to the hospital. If Dale did not sign the acknowledgments, then this would be a particularly relevant piece of evidence. "Evidence that a defendant engaged in affirmative actions contrary to professionally accepted standards and then sought to cover up those actions does establish gross negligence." *Bellinger v Kram*, 319 Mich App 653, 660; 904 NW2d 870 (2017).

With respect to other statements offered by plaintiff, the trial court appears not to have considered them, possibly concluding that the statements were hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. See MRE 801(c). Hearsay is inadmissible unless an exception applies. MRE 802. To be considered for purposes of summary disposition under MCR 2.116(C)(10), evidence supporting a party's position must be substantively admissible but need not be admissible in form. MCR 2.116(G)(6); *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 373; 775 NW2d 618 (2009). Consequently, the party relying on the evidence does not have to lay a foundation for admission of the evidence for the trial court to consider it on a motion for summary disposition "as long as there was a plausible basis" for admission of the evidence. *Barnard Mfg Co, Inc*, 285 Mich App at 373. See also MCR 2.116(G)(6).

Plaintiff points to Carol's 911 call on October 7th as particularly persuasive evidence, and plaintiff argues that the trial court should have considered it under the hearsay exception for excited utterances. According to the transcripts of the call, Carol called 911 around 5:00 a.m. on the morning of October 7, 2021. When the dispatcher asked what was going on, Carol stated: "I think my husband might have passed away. I'm not sure." Carol indicated that Dale was not responding and she could not feel any breath or pulse, but she was willing to try CPR.

When the dispatcher attempted to talk her through the process and suggested that Dale was on a bed, Carol stated that Dale was in the living room, and then further explained, "We slept out here because the ambulance has been here two days this week and they kept leaving him here and

not taking him to the hospital." The dispatcher explained that Dale needed to be moved out of the reclining chair Carol reported he was in. The dispatcher asked Carol if she wanted to do a "breathing detector to see if he's breathing at all." When Carol indicated that she wanted to, the dispatcher instructed her to get really close to her husband and then indicate every time Dale breathed. At that point, Carol stated: "I got nothing. No. Oh my God." The dispatcher then indicated that he would stay on the line with Carol until the ambulance arrived.

The dispatcher asked whether Dale was tested for COVID-19, then the following dialogue occurred:

> *Caller*: But he, he—they knew that he had it so why bother with a test and so—
>
> *Dispatcher*: Oh.
>
> *Caller:* —then *they were going to take him to the hospital, but they said the hospital was full.* Oh, dear Lord.
>
> *Dispatcher*: Okay. Was he having shortness of breath or anything?
>
> *Caller*: Oh, yeah. Yeah—
>
> *Dispatcher*: Okay.
>
> *Caller*: —he was having a really hard time breathing and we talked to them about that, they came over and he—I don't know what else I could've done.
>
> *Dispatcher*: Right. Okay. All right. They're on their way, okay?
>
> *Caller*: Okay.
>
> *Dispatcher*: We have PD so we have two deputies coming and then we have Tri Hospital and Kimball, okay?
>
> *Caller*: Okay. Oh my gosh. I can't believe this is happening. [(Emphasis added.)]

In this exchange, Carol alludes to statements purportedly made by defendants about going to the hospital but the hospital being full. At first glance, this could look like hearsay within hearsay. But Carol's statement could well be admissible under MRE 803(2), whereby "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" is an exception to the hearsay rule. She made the statements after waking to discover Dale had died in the night. The transcript can be read to show that Carol was overwhelmed by the distress of discovering her spouse dead; arguably, so overwhelmed that she lacked the capacity to fabricate. See, e.g., *Berryman v K Mart Corp*, 193 Mich App 88, 100-101; 483 NW2d 642 (1992). And the statements to which she alludes could very well fall outside the hearsay rule as statements offered against an opposing party. MRE 801(d)(2)(A).

For his part, plaintiff testified that when he saw the paramedics leave his parents' house on October 3rd, he asked them how Dale was doing. Plaintiff recalled that the "taller" paramedic responded:

> I remember him saying that it's probably just COVID. He really needs fluids, and he really needs to get some sleep, but other than that, he should be fine; the hospitals are full, and I really don't think he's going to want to sit in a waiting room for seven to ten hours, or something like that.

Plaintiff recalled the paramedic "jokingly" stating, "[I]t's the twentieth call we've had for COVID today." Plaintiff's testimony regarding statements made by either Robinette or Riehl were not inadmissible hearsay, as again statements offered against an opposing party. MRE 801(d)(2)(A).

This evidence offered in opposition to defendants' motion for summary disposition gave rise to material questions of fact. In viewing the evidence in the light most favorable to plaintiff, considering defendants' admissions that Dale's condition was dire, reasonable minds could differ regarding whether defendants' conduct in twice failing to transport Dale to the hospital for treatment, in representing to Dale that going to the hospital was unnecessary, and in representing that the hospitals were at capacity, was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted. Accordingly, plaintiff met his burden to come forward with evidence to support his claim that defendants' conduct was grossly negligent. Therefore, the trial court erred when it granted summary disposition in defendants' favor.

Lastly, defendants argue that there were alternative grounds for this Court to affirm summary disposition, at the very least, in favor of defendants Riehl and Robinette. They argue that all claims relating to the October 3rd call must be dismissed because the actions occurring during the October 5th call served as an intervening cause that broke the chain of causation between the alleged negligence of Riehl and Robinette and Dale's injuries and death. Although defendants raised this argument below, the trial court did not address it. Moreover, in the proceedings below, defendants gave little to no attention to this alternative ground for summary disposition. Other than citing to some very basic black letter law related to intervening cause, defendants' analysis of this argument was cursory, at best. Defendants have addressed this argument in the same manner on appeal. Defendants have cited no evidence, by an expert witness or otherwise, supporting their contention that the events of October 5th, constituted an intervening cause sufficient to break the chain of causation between the alleged negligence of Riehl and Robinette and Dale's ultimate demise. Under these circumstances, we decline to address this argument for the first time on appeal. See, e.g., *Camden v Kaufman*, 240 Mich App 389, 399; 613 NW2d 335 (2000) ("This Court will not address an issue that was not decided below unless it is one of law for which all the necessary facts were presented.").

For the reasons stated here, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Matthew S. Ackerman
/s/ Christopher M. Trebilcock

-8-